# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NATIONWIDE AGRIBUSINESS
INSURANCE COMPANY and
S & R EGG FARM, INC.,

      Plaintiffs,

      v.                                                                 Case No.  15-CV-1362

MUNTERS CORPORATION and
ZURICH AMERICAN
INSURANCE COMPANY

      Defendants.

---

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Before me is Munters Corporation and Zurich American Insurance Company's (collectively defendants) motion for partial summary judgment under Fed. R. Civ. 56(a) on the question of punitive damages. They argue Nationwide Agribusiness Insurance Company and S & R Egg Farm Inc. (collectively plaintiffs) have not shown sufficient evidence for the question of punitive damage to reach a jury. For the reasons explained below, I recommend defendants' motion be granted.

## BACKGROUND

The underlying facts of this case are detailed in the report and recommendation on defendants' motion for summary judgment. (Docket # 100.)  Here, I focus on the facts and arguments as it relates to the question of punitive damages.

*Relevant Facts*

Munters is a manufacturer of agricultural fans, including Model VX51 direct drive fans ("DC Fans"). Plaintiffs' Statement of Fact ("PSOF") ¶ 1, Docket # 83 and Defendants' Response to Plaintiffs' Statement of Fact ("Defs.' Resp. to PSOF") ¶ 1, Docket # 94.) The DC Fans incorporated Hitachi's WJ200 finless inverter ("Hitachi Inverter"), which was a relatively new product by Hitachi. (PSOF ¶ 4 and Defs.' Resp. to PSOF ¶ 4.) Hitachi Industrial Equipment Systems Co., Ltd., ("HIES") designed and manufactured the Hitachi Inverter. (PSOF ¶ 6 and Defs.' Resp. to PSOF ¶ 6.) Hitachi America, Ltd. (Hitachi America) is the distributor for HIES products. (PSOF ¶ 7 and Defs.' Resp. to PSOF ¶ 7.)

In December 2011, representatives from HIES began discussing with defendants about using the Hitachi Inverters in the DC Fans. (PSOF ¶ 9 and Defs.' Resp. to PSOF ¶ 9.) In March 2012, defendants displayed the new DC Fans at the Midwest Poultry Show in Minnesota. (PSOF ¶ 12 and Defs.' Resp. to PSOF ¶ 12.) Hitachi issued Delivery Specifications for heat dissipation for the finless inverter which identified points for measuring temperatures on the aluminum plate of the Hitachi Inverter. (PSOF ¶ 13 and Defs.' Resp. to PSOF ¶ 13.) Although disputed by defendants, on March 21, 2012 engineers from HIES expressed concerns about Munters not testing the Hitachi Inverter at points directed by their specifications. (PSOF ¶ 14 and Defs.' Resp. to PSOF ¶ 14.)

On April 24, 2012, defendants ordered 1,400 inverters from Hitachi. (PSOF ¶ 17 and Defs.' Resp. to PSOF ¶ 17.) However, HIES informed Hitachi America that they would not be able to meet all of defendants' requirements. (*Id.*) Plaintiffs ordered twenty-six fans on May 2, 2012 for use in one of their barns. (PSOF ¶ 19 and Defs.' Resp. to PSOF ¶ 19.) Plaintiffs' fans were part of the initial production (or prototype) of the DC Fans. (PSOF ¶ 42

and Defs.' Resp. to PSOF ¶ 42.) The initial production fans included fan motor housing made of ABS plastic. (*Id.*) The motor housing was changed to aluminum when it went into full production mode. (*Id.*) On May 4, 2012, at least one of the DC Fans failed. (PSOF ¶ 22 and Defs.' Resp. to PSOF ¶ 22.) On May 5, 2012, Paul Curtis (engineer for Hitachi America) informed Chris Hause (employee for defendants) that a component fell off the input bridge due to excessive vibration of the fan. (PSOF ¶ 23 and Defs.' Resp. to PSOF ¶ 23.) On May 7, 2012, Hause told Curtis that the upper keyboard of the drive vibrated loose from its mounting. (PSOF ¶ 24 and Defs.' Resp. to PSOF ¶ 24.) To combat the excessive vibration, defendants applied a rubber silicone (RTV) to the circuit board. (*Id.*) HIES explained to defendants that applying the RTV on the inverter circuit board would void the warranty. (PSOF ¶ 27 and Defs.' Resp. to PSOF ¶ 27.)

On May 7, 2012, Curtis expressed concerns about the vibration issues and stated "sending hundreds of units out into the field not knowing if we're going to have a vibration issue seems a bit reckless. . . ." (PSOF ¶ 28 and Defs.' Resp. to SOF ¶ 28.) On May 18, 2012, an engineer from HIES instructed defendants (by e-mail) to use an encoder on the Hitachi Inverter to prevent a "fire on the motor." (PSOF ¶ 31 and Defs.' Resp. to SOF ¶ 31.) Defendants did not conduct testing to determine the exact level of vibration in the DC Fans. (PSOF ¶ 33 and Defs.' Resp. to SOF ¶ 33.) On June 7, 2012, defendants shipped the fans ordered by plaintiffs. (PSOF ¶ 34 and Defs. Resp.' to SOF ¶ 34.)

Plaintiffs assert that "conduct during the design process" before the fire occurred gives rise to punitive damages. (Plaintiffs' Opposition to Partial Summary Judgment ("Pls.' Resp.") at 8, Docket # 86.) Plaintiffs argue that defendants "rushed a product to market" despite: (1) insufficient testing, (2) a defect in the motor, (3) the fan being a "prototype"

product, and (4) defendants being unwilling to change any defects or address any known risks.

      *1.      Fans Rushed to Market*

Plaintiffs argue that defendants rushed the product to market without sufficient testing to be sure of known risks. Specifically, plaintiffs assert that they were sold fans "without fire testing, without end of life testing, without performing testing directed by HIES, without performing vibration testing after serious issues arose, and despite known concerns and warnings by engineers at HIES and Hitachi America." Plaintiffs note that Hitachi recognized defendants' production schedule as "aggressive" and that there were disputes between Hitachi and defendants about getting fans to the field. Defendants respond that, like any other business, defendants wanted to get their product to the market as soon as possible, but this does not give rise to a claim for punitive damages. (Defendants' Brief in Support for Partial Summary Judgment ("Defs.' Partial S.J Br.") at 9, Docket # 60.)

      *2.      Prototype Fan*

Plaintiffs argue that defendants sold a prototype fan without plaintiffs' knowledge. Plaintiffs argue "[h]iding from customers that they are purchasing a product that has not been fully tested or developed" is evidence that the jury should consider punitive damages. (Pls.' Resp. at 15.) Defendants argue that the term "prototype" is merely semantic because the only difference between the prototype fans and the production fans was the plastic enclosure, which was changed because of cost savings and does not give rise to a claim for punitive damages. Plaintiffs state that even if costs were the reason Munters made the change to the enclosure from plastic to aluminum, their experts testify that plastic is

extremely flammable and defendants should have "tested the differences in temperature between the prototype and production fans." (Pls.' Resp. at 16.)

### 3. Fire Hazard Warnings

Plaintiffs argue that defendants ignored fire hazard warnings. Regarding the inverter clearance requirements specifically, plaintiffs point to HIES instructing defendants that clearances in the Hitachi Manual for the finned inverter also applied to the finless inverter that was used by defendants. (Pls.' Resp. at 17.) Because defendants' design clearly did not meet the specifications as outlined in the Hitachi Manual and plaintiffs' expert, Steven Hamilton, opined that defendants' clearances were inadequate, defendants' failure to perform temperature testing was an intentional disregard for the safety of their customers. (Pls.' Resp. at 17-18.) Defendants respond that it is undisputed that the Hitachi Manual only applied to the finned inverter, not the finless inverter defendants used. (Defs.' Partial S.J. Br. at 12.)

Defendants refer to Hitachi America's engineer Paul Curtis, who informed defendants that the clearance requirements for the finned inverter did not apply to the finless inverter. (*Id*.) Defendants also point to plaintiffs' expert Hamilton, who testified that the Hitachi Manual did not apply to the finless inverter. (*Id*.) In response, plaintiffs argue that Curtis cannot speak to the specifications of the inverter because he is an engineer for Hitachi America (the distribution company) while HIES is the manufacturer and designer of the Hitachi Inverter.

### 4. Capacitor and Vibration Issues

Plaintiffs argue that defendants ignored warnings from Hitachi and the capacitor manufacturer of a potential catastrophic failure related to extreme conditions or excessive

vibration. Specifically, plaintiffs assert that while the inability to inspect the capacitor was a design flaw, a jury could conclude that enclosing an inverter in a tight space (1) increased the risk of a fire and (2) increased the chance that it would spread. Further, plaintiffs assert that defendants never tested the clearance requirements for the finless converter and cannot simply rely on Hitachi America engineer Curtis that the manual did not apply to the Hitachi Inverter. (Pls.' Resp. at 19.) Plaintiffs point to their expert Hamilton, who opined that the capacitor broke down from a combination of overheating and excessive vibration resulting in a short circuit which initiated the fire.

Plaintiffs also argue that defendants ignored vibration issues. Specifically, plaintiffs point out Curtis' e-mail to defendants stating "sending hundreds of units out into the field not knowing if we're going to have a vibration problem seems a bit reckless." (Pls.' Resp. at 22.) Defendants responds with testimony from Curtis stating that he meant "reckless" from an economic standpoint, not an issue of safety.

5.    *Inadequate Testing*

Plaintiffs argue that defendants' refusal to perform additional testing is a basis for a jury to award punitive damages. Plaintiffs point to an e-mail exchange where HIES explained that defendants' testing measured the temperature at the cold plate, not the inverter plate. (Pls.' Resp. at 21.) Plaintiffs assert that defendants ignored HIES' request for further testing and that a jury could conclude that refusing to conduct further testing warrants punitive damages. (*Id.* at 22.) Defendants respond that plaintiffs have produced no evidence to show that they were out of compliance with Hitachi's temperature specifications. Specifically, neither Hamilton nor Todd Hartzler (another expert for plaintiff)

testified that defendants' temperature testing was out of compliance with Hitachi's requirements.

      *6.      E-mail and Running Design Issue*

Plaintiffs assert that defendants ignored warnings from an HIES representative that its design could result in a "fire in the motor." Plaintiffs argue that this fact should go to the jury. (Pls.' Resp. at 25.) Additionally, plaintiffs point to e-mails from defendants stating that it would not fix fans that were already in the field. Defendants assert that the recipients of the e-mail (Hitachi America engineer Paul Curtis as well as defendants' employee) understood "fire in the motor" to be referencing motor burnout, not a fire hazard. Similarly, defendants assert that their statements about running design changes all related to product improvements and cost reductions; not safety issues.

## ANALYSIS

Punitive damages in Wisconsin are governed by Wis. Stat. § 895.85(3). Section 895.85(3) provides:

> (3) STANDARD OF CONDUCT. The plaintiff may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff.

In *Strenke v. Hogner*, 2005 WI 25, ¶ 25, 279 Wis. 2d 52, 65, 694 N.W. 2d 296, 302, the Wisconsin Supreme Court explained that under the common law, punitive damages could be awarded if the defendant acted (1) maliciously, or (2) in wanton, willful and in reckless disregard of the plaintiff's rights. However, when the Wisconsin legislature enacted Wis. Stat. § 895.85(3), it changed the second category of conduct to "intentional disregard of the rights of the plaintiff." *Id.* ¶ 27. The Wisconsin Supreme Court stated that with this change, the Wisconsin legislature "intended to require an increased level of consciousness and

deliberateness at which the defendant must disregard the plaintiff's rights in order to be subject to punitive damages. *Id.* ¶ 34.

Plaintiffs do not contend defendants acted maliciously; thus, I will focus on the "intentional disregard" standard. Under the heightened standard, "a person acts in an intentional disregard of the rights of the plaintiff if the persons acts with a purpose to disregard the plaintiff's rights, or is aware that his or her acts are substantially certain to result in the plaintiff's rights being disregarded." *Id.* ¶ 38.

Although addressing punitive damages under the lower common law standard, the Wisconsin Supreme Court in *Sharp ex rel. Gordon v. Case Corp.*, 227 Wis. 2d 1, 21, 595 N.W.2d 380, 389 (Wis. 1999) explained: "Punitive damages may be awarded in product liability suits if the plaintiff proves by clear and convincing evidence that the harm suffered was the result of the manufacturer's reckless disregard for the safety of product users, consumers or others who might be harmed by the product." The court in *Sharp* further explained:

> [A] manufacturer may be found to have acted in reckless disregard if, after having gained specific knowledge of a product's defect and its potential harm, the manufacturer fails to take some action that the defect demands, such as adequate testing procedures, effective quality control, sufficient warnings or adequate remedial procedures such as product recalls or post-sale warnings.

*Id.*

Courts must act as "gatekeepers" before a claim for punitive damages is sent to a jury. *Strenke*, 2005 WI 25, ¶ 40. A question of punitive damages should not reach a jury unless the court concludes that a reasonable jury could find that entitlement to punitive damages has been shown by clear and convincing evidence. *Id.* ¶ 41. Further, punitive damages are not recoverable for merely negligent conduct. *Id.* ¶ 42. "Only when the conduct

is so aggravated that it meets the elevated standard of an 'intentional disregard of rights' should a circuit court send the issue to a jury." *Id.*

In this case, plaintiffs have not shown by clear and convincing evidence that the question of punitive damages should reach a jury. None of the conduct plaintiffs allege, alone or collectively, constitute actions that were aggravated enough to warrant punitive damages. First, rushing fans to the market or selling fans deemed as prototypes do not rise to the level of intentionally disregarding the rights or safety of the plaintiffs absent evidence that defendants "gained specific knowledge of a product's defect and its potential harm" and failed to act accordingly. *Sharp*, 227 Wis. 2d at 21. Plaintiffs provide no legal support for the argument that not informing their customers that the product is a "prototype" is sufficient evidence that the jury should consider punitive damages. This is especially apparent considering that the only difference between the prototype fans and the production fans is the plastic motor enclosure; a device plaintiffs do not allege was defective.

Next, a failure to comply with Hitachi's clearance requirements does not warrant punitive damages. Plaintiffs assert that Steve Hamilton testified that, in his opinion, defendants' clearances for the Hitachi Inverter were inadequate. However, Hamilton did not testify that the clearances were not in compliance with Hitachi specifications and even stated the clearance requirements for the finned inverter were not the same as for the finless inverter. (Hamilton Dep. at 19, Docket # 87-2.) Hamilton also stated that it was not unreasonable for defendants to rely on Hitachi's engineers who informed them that the clearance requirements were not the same. Nevertheless, plaintiffs argue that "[defendants'] failure to perform any testing to ensure it had adequate clearance is evidence of an intentional disregard for the safety of [defendants' customers.]" Plaintiffs provide no legal

support for this argument. At most, plaintiffs have an argument for negligence. But as Wisconsin law has made clear "punitive damages are not recoverable for merely negligent conduct." *Strenke*, 2005 WI 25, ¶ 42.

Furthermore, plaintiffs' argument regarding the capacitor failing from being exposed to overheating and/or excessive vibration fails. Plaintiffs assert that defendants were warned of catastrophic failure because of extreme conditions or vibrations, which necessitates that the question of punitive damages reaches a jury. However, plaintiffs cite to Hamilton's expert report in support of this assertion, which in turn cites to the Panasonic Aluminum Electrolytic Capacitor Guide. (PSOF ¶ 91.) Plaintiffs argue that the decision to not test clearance requirements intentionally disregarded the rights of [defendants'] customers is an issue fact for trial. I disagree. While it is plaintiffs' theory that the capacitor failed due to excessive heat and vibration, plaintiffs present no evidence that defendants were aware this combination of factors could result in catastrophic failure and chose to ignore the risk. Plaintiffs must establish by clear and convincing evidence that defendants deliberately disregarded their rights to a safe product.

Plaintiffs' arguments concerning inadequate testing are also unpersuasive. Plaintiffs point out that HIES explained to defendants that they did not measure the inverter plate, but rather measured the fan's "cold plate." (Pls.' Resp. at 21.) This meant that defendants did not measure the temperature of the inverter and "ignored the request" to do follow up with more temperature testing. (*Id.*) Again, plaintiffs provide no evidence that defendants' fans did not conform to Hitachi's temperature requirements for the inverter plate. Plaintiffs admit "no one has ever performed the testing specified by HIES." (Pls.' Resp. at 22.) With no evidence that defendants' inverter plate temperature testing was inadequate, plaintiffs

have not met their burden to establish that a reasonable jury could find for punitive damages.

Additionally, defendants placing silicone RTV to component parts on the inverter circuit board does not amount to aggravated conduct that would warrant punitive damages. Plaintiffs assert that this "quick-fix" to the vibration issue would interest a jury. However, interesting facts, negligent conduct, or even "reckless" conduct does not warrant punitive damages. *Strenke*, 2005 WI 25, ¶ 27 (explaining that the punitive damages statute changed the common law standard of "wanton, willful, and in reckless disregard of the plaintiff's rights" to "an intentional disregard of rights"). Punitive damages require that defendants be aware that its acts are substantially certain to result in the plaintiff's rights being disregarded. *Id.* ¶ 36. The evidence does not support that assertion.

Finally, plaintiffs argue that an e-mail from an engineer at HIES referencing a "fire in the motor" shows that defendants ignored potential risks of a fire. This argument fails for two reasons. First, plaintiffs do not allege that a fire started in the motor and there is no evidence that it did. Again, for punitive damages, defendants must be aware that their actions are substantially certain to result in the disregarding of plaintiffs' rights. Second, defendants put forth testimony from a Hitachi America engineer stating that a fire in the motor was understood to mean "motor burnout." (Defs.' Partial S.J. Br. at 20-21.) Plaintiffs provide no evidence to counter this assertion. It is plaintiffs' burden to establish that there is sufficient evidence to reach a jury on punitive damages. Plaintiffs fail to do so.

## CONCLUSION

The Seventh Circuit has stated that summary judgment is the "put up or shut up" moment in a lawsuit. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010). While

plaintiffs argue and assert defendants intentionally ignored known risks, they fail to put forth evidence that defendants gained specific knowledge of the product's defect and its potential harm and failed to take action. Thus, plaintiffs have not shown that a reasonable jury could find, by clear and convincing evidence, that they are entitled to punitive damages. For the reasons explained above, I recommend that defendants' motion for partial summary judgment on plaintiffs' punitive damages claim be granted.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendants' motion to for partial summary judgment (Docket # 59) be **GRANTED**.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 8th day of August, 2018.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge